# United States District Court
### for the
### Western District of New York

United States of America

v.

ALEXANDER J. BUIE

Case No. 15-MJ- 4149

*Defendant*

## CRIMINAL COMPLAINT

I, Christopher Mahaffy, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about August 26, 2015, in the Western District of New York, the defendant violated offenses described as follows:

knowingly and unlawfully possessed with intent to distribute, a mixture and substance containing alpha-PVP, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

**SEE ATTACHED AFFIDAVIT OF SPECIAL AGENT CHRISTOPHER MAHAFFY.**

This Criminal Complaint is based on these facts:

☒ Continued on the attached sheet.

_____
*Complainant's signature*

SA Christopher Mahaffy, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: August 27, 2015

_____
*Judge's signature*

HONORABLE MARIAN W. PAYSON
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

City and State: Rochester, New York

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA                          15-MJ-

-vs-

ALEXANDER J. BUIE,

                Defendant.

---

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

Christopher Mahaffy, being duly sworn, deposes and says:

1. I am a Special Agent with the Drug Enforcement Administration (DEA), and as such I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510 (7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21, United States Code, Section 801, et seq. and Title 18, United States Code, Section 2516 (1).

2. I have been employed with the Drug Enforcement Administration (DEA) since May 4, 2014. I am currently assigned to the DEA Rochester Resident Office. Prior to being assigned at the Rochester Resident Office, I completed 18 weeks of training at the DEA Office of Training, located in Quantico, Virginia. My training included classroom preparation in drug trafficking networks, drug identification, as well as practical application of surveillance, drug

investigation, and arrest procedure. During my time at the Rochester Resident Office, I have participated in several investigations involving drug trafficking and organized crime matters, including a two long-term narcotics investigations that utilized the court-authorized interception of wire communications. Furthermore, I have been involved in the execution of several state and/or federal search warrants involving narcotics trafficking. In addition, I have had the opportunity to work with other DEA agents and law enforcement officers, who have also investigated drug trafficking networks. As a result of all of the above, I am thoroughly familiar with the manner in which narcotics and other controlled substances are obtained, packaged, distributed, sold, and used. Moreover, I am familiar with the coded language and jargon used by the individuals engaged in narcotics trafficking to reference various narcotics and controlled substances, as well as the ways in which illicit drug sellers and users attempt to disguise their conversations relating to their activity by the use of codes, cryptic phrases, abbreviated words and prearranged terminology.

## PURPOSE OF AFFIDAVIT

3. This affidavit is made in support of a criminal complaint charging Alexander J. BUIE with possession with intent to distribute approximately 969.4 grams of alpha-PVP in violation of 21 United States Code, section 841(a)(1).

## GENERAL BACKGROUND ON SYNTHETIC DRUGS AND ANALOGUES

4.     Since in or about February 2011, the DEA has been investigating the increased importation, distribution, and use of synthetic drugs, popularly referred to as "bath salts" or "molly." Synthetic drugs, as opposed to controlled substances processed from naturally occurring substances (like cocaine or opium), are chemically produced in a laboratory. Their chemical structure can be either identical to, or slightly modified from, those of controlled substances processed from naturally occurring substances, and their effects are designed to mimic or even enhance those of naturally derived drugs. Often times, unlawful manufacturers of these synthetic, or designer, drugs will attempt to tweak the molecular structures of known controlled substances, all in an attempt to circumvent existing drug laws. Once produced, however, these synthetic products model the same euphoric and stimulative effects of cocaine or methamphetamine, the hallucinogenic effects of LSD or MDMA (ecstasy), or the disassociative effects of anesthetics like ketamine, PCP, or PCE.

5.     In recent years, individuals have begun to manufacture and traffic synthetic cannabinoid products as well. These products are sometimes referred to on the street as "Spice" or "K2," two popular brand names used in the past for these products. Synthetic cannabinoid products are a mixture of an organic "carrier" medium, such as the herb-like substance Damiana, which is then typically sprayed or mixed with a synthetic compound chemically similar to THC (tetrahydrocannabinol), the psychoactive ingredient in marijuana. Currently, there are hundreds of synthetic cannabinoid compounds. Five of the most common of these compounds were "emergency scheduled" by the DEA in March 2011.

6.      In October 2011, the United States Drug Enforcement Administration (DEA) exercised its emergency scheduling authority to control three synthetic drugs which were similar in chemical structure to Cathinone, a Schedule I stimulant. This list included 4-methylmethcathinone a/k/a "Mephedrone" or "4-MMC"; 3,4 methylenedioxypyrovalerone a/k/a "MDPV"; and, 3,4 methylenedioxymethylcathinone a/k/a "Methylone" or "MDMC." These synthetic drugs have traditionally been marketed under names such as "Ivory Wave," "Purple Wave," "Vanilla Sky" or "Bliss." Users reported impaired perception, reduced motor control, disorientation, extreme paranoia, and violent episodes. The long term physical and psychological effects of use are unknown but potentially severe. Except as authorized by law, the emergency scheduling made possessing and selling these chemicals, or the products that contain them, illegal in the United States. This emergency action was necessary to prevent an imminent threat to public safety.

7.      Your affiant is aware that, effective July 9, 2012, the President of the United States signed in to law The Synthetic Drug Abuse Prevention Act of 2012, which placed several synthetic compounds into the Controlled Substance Act (CSA) as Schedule I controlled substances pursuant to 21 U.S.C. § 812(c). Some of the common synthetic cannabinoid substances listed include: JWH-018, JWH-019, JWH-250, JWH-081, JWH-122, JWH-398, JWH-203, JHW-073, JWH-200, AM2201, AM678, AM694, SR-190, RCS-4, SR-18 RCS-8, CO-47,497 and CP-47,497 Homologue. Some common synthetic "bath salts" substances were also added to Schedule I of the CSA, including Methylmethcathinone (also known as 4-MMC or mephedrone) and Methylenedioxypyrolvalerone (MDPV).

4

8.      Unfortunately, the synthetic drugs being manufactured by profit-seeking peddlers, such as those detailed in this affidavit, are not limited to the synthetic compounds listed above. DEA chemists have seen an increase in the number of investigative submissions pertaining to other synthetic drugs, including "alpha-PVP" (alpha-Pyrrolidinopentiophenone or alpha-Pyrrolidinovalerophenone), "Pentedrone" (2-(Methylamino)-1-phenyl-pentane-1-one), "MPPP"(4'-Methyl-pyrrolidinopropiophenone), "UR-144" 1-Pentyl- 3-2,2,3,3 tetramethylcyclopropoyl indole) and "AM2201" (1-(5Fluoropentyl)-3-(1-naphthoyl)indole). It should be noted that "alpha-PVP" is commonly referred to as flakka or gravel by drug dealers.

9.      Chemical and Pharmocological Experts at the DEA's Special Testing Laboratory determined that "Alpha-PVP" , "Pentedrone," "MPPP," "UR-144" and "AM2201" qualify as "controlled substance analogues" under Title 21 of the Controlled Substances Act, meaning that they are man-made designer drugs that resemble a Schedule I or II controlled substance both in molecular or chemical structure and are expected to have substantially similar actual or purported pharmacological effect. Pentedrone is an analogue of methcathinone, a Schedule I stimulant. Alpha-PVP and MPPP are analogues of MDPV, a Schedule I stimulant similar to MDMA (ecstasy). UR-144 and AM2201 are analogues of JWH-018, a Schedule I hallucinogen, similar in effect to THC. The DEA made the determination as to the analogue status of Alpha-PVP and MPPP in December 2011. The DEA's determination as to the analogue status of Pentedrone was made in February 2012. Finally, the DEA's determination concerning UR-144 was made in April 2012 and AM2201 was made in May 2011.

10.     For purposes of this affidavit, it should be noted that pursuant to 21 U.S.C. § 813, a "controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purpose of any Federal law as a controlled substance in schedule I". Accordingly, it is unlawful to knowingly possess and/or distribute an analogue substance under federal law, if intended for human consumption.

11.     Based upon my involvement in this case and conversations with other agents working similar cases, I have learned that companies located in China and India are principally responsible for manufacturing and exporting these synthetic compounds to the United States. Exporters of these compounds typically mislabel the product to evade detection by customs or other law enforcement, and sell the drugs via the Internet to distributors around the world, including in the United States. Distributors in the United States then sell the drugs online, through traditional distribution methods or by retail distribution at convenience stores, gas stations, and head shops. Packages of these drugs are often sold in individual dose containers (foil packets or plastic/glass vials) which may be improperly labeled as "bath salts," "lady bug attractant," "plant food," "hookah/glass cleaner," and "shoe deodorizer." Additionally, distributors will "cut" or dilute these products with powdered caffeine, benzocaine, lidocaine, and other white/off-white powders typically used by "conventional" narcotics traffickers to dilute controlled substances like cocaine and methamphetamine.

12.     Dealers, manufactures and distributers of these synthetic drugs frequently place visible written labels on the packaging indicating that the substances are "not for human consumption" or "50 states legal." However, the effort is a complete ruse; human consumption

6

is the only known use of these compounds. Additionally, even though the specific compound or compounds contained within the packaging may not be listed by name in the Federal Schedule of Controlled Substances, the substances can still be classified as a Controlled Substance Analogue in Schedule I per 21 U.S.C. § 802(32) and 813.

## PROBABLE CAUSE FOR ARREST OF ALEXANDER J. BUIE

13. On Wednesday, August 26, 2015, at approximately 6:25 p.m., members of the DEA Rochester Resident Office and ICE-HSI Buffalo (hereafter agents) executed a federal search warrant authorized by United States Magistrate Judge, Marian W. Payson at a residence located at 685 Bailey Rd, Henrietta, New York (hereafter the residence). Agents were assisted by deputies from the Monroe County Sheriff's Office. Upon entry, agents located and detained four individuals, among these four was Alexander J. BUIE. BUIE was detained without incident in a den/bedroom located on the first floor of the residence.

14. Once the residence was secure, agents conducted a search for items listed in the search warrant. Since it was clear that other occupants resided at the residence, agents limited their search to common areas, the den/bedroom believed to be BUIE's room, closet, and bathroom. Agents located multiple bags with various labels containing off white to white powdery substances. These items were located in a gray plastic box behind the computer desk in BUIE's room. The next morning, agents removed the contents of the gray plastic box to display its contents, process it as evidence, and take a photograph (Attachment A). Additionally, agents located bulk quantities of empty gel capsules, clear plastic baggies, dilutants, measuring cups,

7

measuring spoons, and scales indicative, in my training and experience, of packaging these alleged controlled substances for human consumption and/or distribution. A photo of several items was taken the following day (Attachment B). Agents also seized multiple identification documents from the closet and room believed to be BUIE's room.

15.  Prior to exiting the residence, agents confirmed that the three remaining individuals were allowed to be in the residence without BUIE being there and that they were paying tenants. Agents left a copy of the search warrant face and a receipt of items seized on the kitchen counter. BUIE was transported by Monroe County Sheriff's deputies to the federal building where he was processed. BUIE was then transported by DEA agents to the Monroe County Jail to be lodged overnight pending his initial appearance in federal court.

16.  The morning of August 27, 2015, agents conducted a pre-processing inventory of the above mentioned drug exhibits and discovered that an item located during the search warrant was not among the items inventoried. This item was photographed on August 26, 2015 at the time of its location in its original position, adjacent to a large computer desk in BUIE's bedroom (Attachment C). This item was a clear, re-sealable plastic bag containing chunks of a brown crystalline substance. At approximately 9:20 a.m. on August 27, 2015, agents returned to the residence, obtained verbal consent to search from two individuals who reside at the residence. Agents then entered the unlocked area where the aforementioned item was observed in plain view as originally discovered, and seized it as evidence. The agents noted that the material condition of the bag containing the brown crystalline substance was located in the same area that it was originally discovered (Attachment D).[1] Agents transported this clear bag

8

---

[1] Your affiant has placed his initials on Attachment C & Attachment D acknowledging those photographs accurately depict the location of the brown crystalline substance upon the entry of the premises on August 26, 2015 & August 27, 2015. CM 8/27/15

containing the brown crystalline substance to the DEA Rochester Resident Office, where, at approximately 9:45 a.m., it was field tested by your affiant, returning a positive result for alpha-PVP. The field test kit used was a Sirchie-branded "Nark II" Model 26 field test kit specifically made to test for the presence of alpha-PVP.

**WHEREFORE**, based upon all of the foregoing, and upon my training and experience, Alexander J. BUIE possessed with the intent to distribute a mixture and substance containing a quantity of alpha-PVP, a schedule I controlled substance, in violation of 21 United States Code, section 841(a)(1).

_____
CHRISTOPHER MAHAFFY
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me
this 27 day of August, 2015.

_____
HON. MARIAN W. PAYSON
United States Magistrate Judge

9

# ATTACHMENT A



# ATTACHMENT B



# ATTACHMENT C





# ATTACHMENT D